**EXHIBIT "A"**

**DECLARATION OF RUSSELL B. WEEKES**

Russell B. Weekes (10214)
Tyler Vermillion (14457)
**Capstone Law, LLC**
207 East 860 South
Orem, Utah 84058
T: (801) 783-1888
F: (888) 612-4236
E: *ecf@capstonelaw.net*
*Attorneys for Defendants*

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF UTAH

---

| In re:<br><br>**BRETT JASON HAZLETT,**<br><br>  Debtor. | CASE No. 16-30360<br><br>Chapter 7<br><br>JUDGE Kevin R. Anderson |
| --- | --- |

---

### DECLARATION OF RUSSELL B. WEEKES

---

Comes now Russell B. Weekes and declares under penalty of perjury as follows:

1.      I am over the age of 21 and have personal knowledge of the contents of this Declaration.

2.      I am a duly licensed attorney in the State of Utah and in the United States District Court, District of Utah, bar no. 10214.

3.      I am the principal of Weekes Law, PLLC d/b/a Capstone Law, LLC ("Capstone") and my principal office location as of January 2017 was at 179 North 1200 East, Ste. 104 Lehi, Utah 84043 ("Office").

### INITIAL CONSULTATION

4.      On October 27, 2016 at 4:30 I met with Brett Hazlett ("Hazlett") for an initial bankruptcy consultation in my Office.

5.      Prior to the initial consultation Hazlett completed an intake form ("Intake Form").

6.      The Intake Form contains instructions to "completely, accurately and honestly complete all questions on each page" of the form.

1

7.      The Intake Form asks for the number of household (including you, your spouse and all dependents, to which Hazlett answered: 1.

8.      The Intake Form asks for any Cash and Cash Accounts (checking, savings, CDs, and Money Market). Hazlett left this section blank.

9.      The Intak Form asks if there have been any payments to friends or relatives of more than $300 in the past three months, to which Hazlett answered "No."

10.     Hazlett attested that he understood and agreed that the information on the Intake Form was true, accurate and complete to the best of his knowledge and that he listed all of his assets and debts.

11.     During initial consultations I review the Intake Form, ask questions to confirm the information provided on the Intake Form is accurate and complete and I take notes in our matter management system as well as in our case preparation software. I followed that process during the initial consultation with Hazlett.

12.     During the initial consultation I asked numerous questions to confirm Hazlett's self-reported information regarding his financial background, including without limitation: income, assets, liabilities, prior bankruptcies, marital status, dependents, urgency to file, property in his possession that belongs to another person, payments of debts—with a particular attention to insider payments, child support or alimony payments, income taxes, other debts to governmental agencies, debts that may be owed to Hazlett, and causes of actions that Hazlett may have.

13.     During the initial consultation I proposed three payment options for a chapter 7:

    a.  Pay the entire fee upfront at a discount of $1,600 total;

    b.  Pay $500 down to file an emergency bankruptcy filing and monthly payments thereafter; or

    c.  Pay $0 down to file an emergency bankruptcy filing and monthly payments thereafter for a total of $2,400 inclusive of costs.

14.     The Debtor explained that he could not pay anything upfront and that he wanted to proceed under the $0 down option.

2

15.     I reviewed and explained paragraph by paragraph the Affordable Bankruptcy Agreement a/k/a Two Contract Procedure, Two-Contract Disclosure, Exhibit A Section 527(a) Disclosure, Section 527(b) Disclosure, and Third-Party Disclosure and Consent (collectively "Pre-petition Agreement").

16.     The Debtor did not sign the paper copy presented to him during the Initial Consultation, so the agreement was e-mailed to him using a commercially available E-signature software application Adobe Sign, in electronic form, to be reviewed and signed by electronic means.

17.     The Pre-Petition Agreement contains several fields, which require or permit the recipient's interaction by clicking on the field and inputting requested information, including an address, payment method, payment dates and payment amounts under the Fee Check Draft Authorization section.

18.     The Pre-petition Agreement was sent to Hazlett with the fields under the Fee Check Draft Authorization blank.

19.     Hazlett typed in the information that is found in the address information, payment dates, payment amounts and Payment Method fields prior to signing the Pre-petition Agreement.

20.     Upon engagement Hazlett completed a second form called the Client Questionnaire, which *inter alia* serves as a cross-check of the information provided on the Intake Form.

21.     Prior to preparing and providing the bankruptcy papers to Hazlett to review and sign, our staff conducted two additional interviews with Hazlett to cross-check and ensure that hasn't omitted any information on his forms.

22.     At no time during the initial consultation or on any of the forms provided to our office did Hazlett inform me that he was using his girlfriend's bank account. Moreover, on his prepetition agreement Hazlett that he would bring in payments manually instead of billing a checking or prepaid debt card.

23.     At no time during the initial consultation or on any of the forms provided to our office did Hazlett inform me that he had any dependents.

3

24.     At not time during the initial consultation or on any of the forms provided to our office did Hazlett inform me that he was making payments on his girlfriend's car.

25.     Hazlett was provided a hard copy of our Client Questionnaire during his in-office visit and the instructions that appear at the top were reviewed with him.

26.     The Instructions on the Client Questionnaire contain the following instructions and admonishments to Hazlett: "Please be absolutely candid and provide as much information as possible; too much information is better than too little. As your Attorneys, we ask that you be open and candid, so that we can give you the best advice possible. If you withhold information from us because you are embarrassed or don't want to disclose all of your assets and/or debts, we cannot effectively represent you. Further, **it is a crime if you don't list all your assets and debts**. It's simply not worth the jail time to withhold information. In addition, providing false information is grounds for us to withdraw from your case." And to "PLEASE ANSWER ALL QUESTIONS: IF NOT APPLICABLE, PUT N/A. DO NOT LEAVE QUESTIONS UNANSWERED."

## PROCESS TO FILE HAZLETT'S CASE

27.     Our document collection team called Hazlett after we received the signed the retaining agreement, he didn't pick up, so they sent an email providing an overview of the documents and information needed to prepare and file his case. The email invited Hazlett to call if he had any questions. The email #1 is attached as Exhibit "C".

28.     Hazlett was sent an email with the link and instructions for taking the credit counseling course on November 2, 1016 at 5:31 PM.

29.     Our document collection team sent a follow-up email on November 15, 2017 explaining that there were still some missing pieces needed to file his case: (1) he needed to complete the credit counseling course; and (2) we needed paystubs for pay received after October 31, 2016. The email invited Hazlett to call if he had any questions. *See* Email #2 attached as Exhibit "C".

30.     Our communications with Hazlett offer our assistance if he has any questions about completing our Client Questionnaire or providing supporting documents to our firm to contact us.

4

31.     The assertion that our firm did not assist Hazlett in answering questions regarding completing the Client Questionnaire is inconsistent with the written instructions and email correspondence.

32.     The only context that I or any of my staff members can recall conveying the sentiment to Hazlett (or any other debtor) "do the best you can," without offering additional assistance, is in valuing personal property and listing creditors that are not reporting to credit bureaus.

33.     Paula Olsen was the paralegal assigned to prepare Hazlett's emergency petition.

34.     Prior to preparing the bare bones petition, Paula conducted an in-depth interview with Hazlett and downloaded his credit report; This was Hazlett's second in-depth interview.

35.     Before the emergency petition was sent to Hazlett to review and sign, I personally reviewed the petition. During this review, I compared his personal information on the petition (name, address, SSN, chapter, residency requirement) and credit counseling information to the information and documentation provided to our office.

36.     Once I approve the emergency petition, an automated email is sent to the assigned paralegal and to the client indicating that the documents may be sent to the client for review and signature.

37.     The following instructions are contained in the body of the email as well as pop-up instructions when all bankruptcy papers are opened electronically:

*Please find the attached Petition, statement, and schedules. Please CAREFULLY REVIEW EACH PAGE TO ENSURE THAT IT IS COMPLETE, ACCURATE, AND TRUTHFUL.*

*1 - Schedule A should list any real property in which you have an ownership interest. This includes land, a home, time shares or other real estate.*

*2 - Schedule B should list all of your personal property. Carefully read each line to ensure that nothing is missing and that the information provided is complete and accurate. This schedule should include any money on hand, money owed to you, all personal possessions like furniture, tools, clothing, jewelry, and equipment.*

*3 - Schedule D should list your all of your secured creditors such as your mortgage, car loans, and other debts that are attached to collateral. A good rule*

5

*of thumb is if you stop making a payment to a creditor and you believe they can take the property back, the creditor should be listed on this schedule.*

*4 - Schedule E should list any tax liabilities or domestic support obligations.*

*5 - Schedule G should list any leases you have. This includes apartment eases and cell phone, gym or other service contracts.*

*6 - Schedule H should list any co-debtors there are on any of your loans who are not filing with you.*

*7 - Schedule I shows an average of your projected income moving forward.*

*8 - Schedule J is the monthly household budget.*

*9 - Carefully review each question and each answer on the Statement of Financial Affairs.*

*IF YOU HAVE ANY QUESTION, OR ANY CHANGES THAT NEED TO BE MADE, PLEASE DO NOT SIGN AND CONTACT US IMMEDIATELY. If everything looks accurate, please promptly sign the document.*

38.     Hazlett received these written instructions for both the emergency petition and the remaining statements and schedules.

39.     After Hazlett signed the emergency petition and the case was filed with the court and the case number is entered into our matter management system, a task is automatically created for me to send Hazlett his second engagement agreement that we call the Completion Agreement.

40.     Hazlett signed the Completion Agreement the same day it was sent.

41.     Paula Olsen was the paralegal assigned to prepare Hazlett's remaining bankruptcy statements and schedules.

42.      After Paula conducted a third in-depth interview with Hazlett, I personal went over the statements and schedules. During this review, I compared the Debtor's statements and schedules with the information he provided on his Intake Form, Client Questionnaire, and our office notes.

43.     When the statements and schedules appeared correct, I change the status of the Matter in our practice management system, which automatically alerts the paralegal and the

debtor that the petition, statements and schedules are ready to be sent to the debtor for review and signature.

44.     After Hazlett signed the completed statements and schedules, I signed them.

45.     Prior to Hazlett's 341 meeting, our office contacted Hazlett on several occasions via email and telephone explaining when and where the 341 meeting was to be held, what information and documentation that he needed to bring with him.

46.     Prior to Hazlett's 341 meeting our office staff uploaded documents required by the Code and those requested by the chapter 7 trustee.

47.     At no time during this process or on any of the forms or information provided by Hazlett, after the completed documents were filed, or after the 341 meeting was I ever emailed, received a phone call from Hazlett, or otherwise became aware that Hazlett expressed concern or indication that Hazlett had: (1) any questions regarding any property that may have been omitted; (2) deposited money into another person's bank account prior to his bankruptcy case filing; (3) made prepetition car payments on behalf of a third-party; or (4) excluded or omitted any other information from his bankruptcy papers.

**PREPETITION HOURS, HOURLY RATE & SERVICES PROVIDED**

48.     The following hourly rates are the prevailing rates for or office staff, if we were billing on an hourly basis:

    a.   $300.00 per hour for Partner's time;

    b.   $275 per hour for attorney's time (Katherine Kang); and

    c.   $125 per hour for staff time.

49.     The amounts listed on Exhibit "A" were expended in connection with prepetition services on behalf of Hazlett.

50.     The amounts listed on Exhibit "B" were expended in connection with postpetition services on behalf of Hazlett.

### COMMUNICTIONS WITH UST REGARDING ELECTRONIC SIGNATURES

51.     In early 2013 I met with Laurie Cayton from the US Trustee's office to discuss the use of electronic signatures and postpetition payments for bankruptcy services.

52.     I explained how electronic signatures work—the complete document is sent to the debtor to review and sign—and the law surrounding its enforceability.

53.     Ms. Cayton's response was that she did not see a problem with electronic signatures since the debtor received the official forms for signature by electronic means, but that she would check with the other attorney's in the office and get back to me if they saw any legal issues with its use.

54.     They never contacted me to say they had issues with electronic signatures.

55.     I have related this experience to other bankruptcy attorneys on a debtor's counsel listserve. See Russ Weekes, ADOBE ECHOSIGN V. WET SIGNATURES (2014), attached as Schedule D.

56.     Ms. Cayton asserted that UST's position was that post-petition payments arising under a prepetition agreement were stayed and discharged and suggested Defendants draft bifurcated agreements pursuant to *Bethea v. Robert J. Adams & Assocs.*, 352 F. 3d 1125, 1127 (7th Cir. 2003).

57. After the meeting with Ms. Cayton, I researched post-petition payments and reviewed the following cases:

a.   *Lamie v. United States Trustee*, 540 U.S. 526 (2004) (recognized that the debtor is free to use postpetition funds to pay for postpetition legal services);

b.   *In re Walton v. Clark & Washington*, 454 B.R. 537 (Bankr. M.D. Fla. 2011) ("*Walton I*") (court struck a prepetition agreement and postdated checks as a violation of §362);

    c.   *In re Waldo,* 417 B.R. 854 (Bankr. E.D. Tenn. 2009) (court struck down a prepetition agreement and postdated checks as a violation of §362);

    d.   *Bethea v. Robert J. Adams & Assocs.*, 352 F. 3d 1125, 1127 (7th Cir. 2003) (holding that attorney's prepetition agreement for legal fees are discharged, but recommending a bifurcated agreement approach to avoid the ironic position of being too poor to file bankruptcy);

    e.   *In re Walton v. Clark & Washington*, P.C., 469 B.R. 383 (Bankr.M.D.Fla. 2012) ("*Walton II*") (holding that a two-contract procedure is permissible);

    f.   *In re Slabbinck*, 482 B.R. 576 (Bankr. E.D. Mich. 2012) (holding that two-contract approach was permissible under the Bankruptcy Code and ethical rules).

58.      After performing legal research, I drafted bifurcated agreements relying heavily on the requirement outlined in *Walton II* and provided them to Cayton for review.

59.      On March 1, 2013 Ms. Cayton sent me the email response attached as Email #3 as Exhibit "C". Ms. Cayton's email did not raise any issues electronic signatures.

60.      The agreements signed by Hazlett are derived from and substantially similar to the bifurcated agreements that Cayton reviewed approved.

61.      BK Billing is a finance company that extended Capstone credit and lent Capstone $1,800 that was secured by Hazlett's payment obligation arising under the Post-petition Agreement.

62.      As part of their services, BK Billing collects the scheduled payments authorized by the debtor to repay the loan.

63.     If the debtor does not repay, Capstone is required to return the funds to BK Billing.

64.     BK Billing does not approve all cases submitted for funding.

65.     Capstone does not submit all "$0 Down" bankruptcy cases for funding by BK Billing.

66.     No discount is offered to a debtor when a case is rejected by or otherwise not funded by BK Billing.


I declare under penalty of perjury that the foregoing is true and correct.

DATED this 20th day of November 2018.


/s/Russell B. Weekes_____
Russell B. Weekes

**SCHEDULE "A"**

| Date | Description | Staff | Qty | Rate | Amount |
|------|-------------|-------|-----|------|--------|
| 10/13/2016 | Scheduled Consult | Staff | 0.2 | 125 | $ 25.00 |
| 10/17/2016 | Rescheduled Appt | Staff | 0.1 | 125 | $ 12.50 |
| 10/26/2016 | Appt reminder | Staff | 0.1 | 125 | $ 12.50 |
| 10/27/2016 | Initial Consultation | Attorney | 1 | 300 | $ 300.00 |
| 10/28/2016 | communication with client | Staff | 0.1 | 125 | $ 12.50 |
| 11/2/2016 | communication with client | Staff | 0.1 | 125 | $ 12.50 |
| 11/15/2016 | communication with client | Staff | 0.1 | 125 | $ 12.50 |
| 11/15/2016 | communication with client | Staff | 0.1 | 125 | $ 12.50 |
| 11/22/2016 | Review Statements & schedules | Staff | 0.6 | 125 | $ 75.00 |
| 11/22/2016 | Attorney emergency review | Staff | 0.3 | 300 | $ 90.00 |
| 11/22/2017 | Send for signature | Staff | 0.2 | 125 | $ 25.00 |
| 11/22/2017 | File with court | Staff | 0.3 | 125 | $ 37.50 |

**TOTAL PREPEITION SERVICES: $627.50**

11

## SCHEDULE "B"

| Date | Description | Staff | Qty | Rate | Amount |
|------|-------------|-------|-----|------|--------|
| 4/13/2016 | review ECF (Trustee report of no distribution) | Staff | 0.1 | 125 | $ 12.50 |
| 11/23/2016 | review ECF (petition, statement of SSN, Credit counseling, application to filing fees in installments, 341 meeting) | Staff | 0.2 | 125 | $ 25.00 |
| 11/24/2016 | review ECF (deficiency notice, order on motion to pay filing fees in installment | Staff | 0.1 | 125 | $ 12.50 |
| 11/25/2016 | review completion agreement signed & payments | Staff | 0.2 | 125 | $ 25.00 |
| 11/26/2016 | review ECF (deficiency notice, Order to pay filing fees in installment | Staff | 0.1 | 125 | $ 12.50 |
| 12/6/2016 | review ECF (completion documents filed) | Staff | 0.1 | 125 | $ 12.50 |
| 12/6/2016 | Pay Installment payment | Staff | 0.2 | 125 | $ 25.00 |
| 12/6/2016 | Review Completion | Partner | 0.6 | 300 | $ 180.00 |
| 12/6/2016 | review signed docs & sign | Partner | 0.1 | 300 | $ 30.00 |
| 12/6/2016 | completion Prep | Staff | 3 | 125 | $ 375.00 |
| 12/7/2016 | review ECF (installment payment) | Staff | 0.1 | 125 | $ 12.50 |
| 12/9/2016 | review ECF (installment payment receipt) | Staff | 0.1 | 125 | $ 12.50 |
| 12/10/2016 | review ECF & update matter Re: 341 | Staff | 0.2 | 125 | $ 25.00 |
| 12/13/2016 | communication with client | Staff | 0.1 | 125 | $ 12.50 |
| 12/13/2016 | Process payment | Staff | 0.1 | 125 | $ 12.50 |
| 12/19/2016 | communication with client | Staff | 0.1 | 125 | $ 12.50 |
| 12/22/2016 | communication with client | Staff | 0.1 | 125 | $ 12.50 |
| 1/2/2017 | email reminder Re: 341 | Staff | 0.2 | 125 | $ 25.00 |
| 1/2/2017 | Pay Final Installment payment | Staff | 0.2 | 125 | $ 25.00 |
| 1/3/2017 | review ECF (final payment notice) | Staff | 0.1 | 125 | $ 12.50 |
| 1/4/2017 | Filing fee installment payment | Staff | 0.2 | 125 | $ 25.00 |
| 1/5/2017 | Review ECF (final payment) | Staff | 0.1 | 125 | $ 12.50 |
| 1/6/2017 | 341 reminder phone call | Staff | 0.1 | 125 | $ 12.50 |
| 1/9/2017 | Travel | Attorney | 1.7 | 275 | $ 467.50 |
| 1/9/2017 | 341 attendance | Attorney | 1 | 275 | $ 275.00 |
| 1/9/2017 | review DocLink Reminder Re: mandatory docs | Staff | 0.1 | 125 | $ 12.50 |
| 1/10/2017 | Correspondence Re: Debtor ed | Staff | 0.2 | 125 | $ 25.00 |
| 1/22/2017 | File Debtor ed certificate with court | Staff | 0 | 125 | $ - |

| | | | | | |
|---|---|---|---|---|---|
| 1/23/2017 | review ECF & update Matter (Debtor Ed certificate filed) | Staff | 0.2 | 125 | $ 25.00 |
| 1/24/2017 | Process payment | Staff | 0.1 | 125 | $ 12.50 |
| 2/21/2017 | communication with client | Staff | 0.1 | 125 | $ 12.50 |
| 2/21/2017 | Process payment | Staff | 0.1 | 125 | $ 12.50 |
| 3/6/2017 | communication with client | Staff | 0.1 | 125 | $ 12.50 |
| 3/16/2017 | review ECF & Update Matter (order of discharge) | Staff | 0.2 | 125 | $ 25.00 |
| 3/18/2017 | review ECF (Order of Discharge BNC) | Staff | 0.1 | 125 | $ 12.50 |
| 3/21/2017 | Process payment | Staff | 0.1 | 125 | $ 12.50 |
| 3/27/2017 | communication with client | Staff | 0.1 | 125 | $ 12.50 |
| 3/27/2017 | communication with client | Staff | 0.1 | 125 | $ 12.50 |
| 4/4/2017 | Trustee Directive | Staff | 0.5 | 125 | $ 62.50 |
| 4/18/2017 | Process payment | Staff | 0.1 | 125 | $ 12.50 |
| 5/6/2017 | Review ECF & update matter (case closed | Staff | 0.2 | 125 | $ 25.00 |
| 5/30/2017 | Process payment (declined) | Staff | 0.1 | 125 | $ 12.50 |
| 6/5/2017 | Process payment (declined) | Staff | 0.1 | 125 | $ 12.50 |
| 6/6/2017 | Process payment | Staff | 0.1 | 125 | $ 12.50 |
| 6/15/2017 | communication with client | Staff | 0.1 | 125 | $ 12.50 |
| 6/27/2017 | Process payment | Staff | 0.1 | 125 | $ 12.50 |
| 7/25/2017 | Process payment | Staff | 0.1 | 125 | $ 12.50 |
| 8/22/2017 | Process payment | Staff | 0.1 | 125 | $ 12.50 |
| 9/7/2017 | communication with client | Staff | 0.2 | 125 | $ 25.00 |
| 9/19/2017 | Process payment | Staff | 0.1 | 125 | $ 12.50 |
| 11/2/2017 | communication with client | Staff | 0.1 | 125 | $ 12.50 |
| 11/22/2017 | Notice of bankruptcy filing to client | Staff | 0.2 | 125 | $ 25.00 |
| 11/22/2017 | review completion agreement signed | Staff | 0.1 | 125 | $ 12.50 |
| 11/27/2017 | Correspondence Re: 341 | Staff | 0.2 | 125 | $ 25.00 |
| 11/29/2017 | Upload paystubs | Staff | 0.2 | 125 | $ 25.00 |
| 11/29/2017 | Upload bank statements & taxes | Staff | 0.2 | 125 | $ 25.00 |
| 12/2/2017 | File with court | Staff | 0.3 | 125 | $ 37.50 |

**SUBTOTAL POSTPETION SERVICES:  $2,240.00**
**TOTAL HARD COSTS: $393**
**TOTAL: $2,633**

**SCHEDULE "C"**
**EMAIL #1 –**
**Email #2**
**EMAIL 3# - DATED MARCH 1, 2013 FROM LAURI CAYTON**

14



**Weekes, Russ <rbw@capstonelaw.net>**

## RE: Payment after Filing

1 message

---

**Cayton, Laurie (USTP)** <Laurie.Cayton@usdoj.gov>                          Fri, Mar 1, 2013 at 5:05 PM
To: "Weekes, Russ" <rbw@weekeslaw.net>

Thank you very much for providing me with your new agreements.  It appears that they will fully comply with the requirements of the Bankruptcy Code.


**From:** Weekes, Russ [mailto:rbw@weekeslaw.net]
**Sent:** Tuesday, February 26, 2013 11:22 AM
**To:** Cayton, Laurie (USTP)
**Subject:** Payment after Filing


Laurie:

After our discussion I decided I would split the representation into two agreements. I want to be sure I'm in full compliance legally and ethically.

 The first for pre-petition services and the second after the petiton had been filed. Attached are the modified agreements that I'm using, in case you are interested.

Thanks,


--
Russell B. Weekes
Principal
**Weekes Law, PLLC**
SLC: (801) 783-1888
Provo: (801) 228-0017
Toll Free: (888) 818-9221
Fax: (888) 612-4236

UNAUTHORIZED INTERCEPTION OF THIS MESSAGE IS PROHIBITED BY FEDERAL LAW PURSUANT TO 18 U.S.C. 2511 (2006).

*CONFIDENTIALITY NOTICE: This message and any files transmitted with it are CONFIDENTIAL and intended for the use of the individual or entity to whom it is addressed.  The information may also be protected by the attorney-client privilege, work product immunity, or other legal protections.  If you have received this email by mistake, please immediately notify us by reply email or by calling us at (888) 818-9221 and delete it from your system.  You may not copy or forward this message or disclose its contents to anyone.  Email transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses.  The sender therefore does not accept liability for any errors or omissions in the contents of this message that arise as a result of email transmission.

*CIRCULAR 230 DISCLOSURE:  Pursuant to U.S. Treasury Department Regulations, any federal tax advice contained in this communication, including attachments and enclosures, is not intended or written to be used, and may not be used, for the purpose of (1) avoiding tax-related penalties under the Internal Revenue Code; or (2) promoting, marketing, or recommending to another party any tax-related matters addressed herein.

**SCHEDULE "D"**
**EMAIL 4# - Russ Weekes, A**DOBE **E**CHO**S**IGN V. **W**ET **S**IGNATURES **(2014)**



**Weekes, Russ <rbw@capstonelaw.net>**

---

## Re: [utahdebtorbankruptcy] Adobe EchoSign v. Wet Signatures
1 message

---

**Weekes, Russ** <rbw@weekeslaw.net>                                                    Wed, Oct 8, 2014 at 5:14 PM
To: Utah Bankruptcy Listserve <utahdebtorbankruptcy@yahoogroups.com>

Andrew - the reason I said they "approved" it in quotes is that Bailey referred me to the trustee's office a few years ago after a client testified at a 341 meeting that they didn't remember signing that everything was done online. Unfortunately I had appearance counsel at that hearing, so I couldn't refresh their memory. Anyway, I met with Lauri Cayton and she reviewed the documents and discussed with me bankruptcy case law, Utah law (cited by Aaron), Utah's e-sign act and the federal e-sign act. At the meeting I told her I would change my e-signing process if they believed it was in violation until a court could rule on it. She told me she thought it was sufficient since the debtors had to sign the actual documents that contain the same attestation's required by the paper and would get back to me after discussing it further with the other members in the office if they thought it was a problem. They have never contacted me regarding that issue since that time.

I agree that the local rule of retention in "paper" form is ambiguous, so a change of the rule would be beneficial to everyone. It seems that a simple change of wording of Local Rule 5005-1(e) from "must be maintained in paper form" to "must be maintained in original form" would be sufficient. What do we need to do to influence a change in the rule?

On Wed, Oct 8, 2014 at 3:31 PM, 'Aaron Nilsen' aaron@utahbk.com [utahdebtorbankruptcy] <utahdebtorbankruptcy@yahoogroups.com> wrote:

> But where do the local rules call for this so called "wet" signature?  Do they not simply say the debtor must sign the document?  In Utah, an electronic signature is a signature.
>
>
> **46-4-201.  Legal recognition of electronic records, electronic signatures, and electronic contracts.**
>
>     (1) A record or signature may not be denied legal effect or enforceability solely because it is in electronic form.
>
>     (2) A contract may not be denied legal effect or enforceability solely because an electronic record was used in its formation.
>
>     (3) If a law requires a record to be in writing, an electronic record satisfies the law.
>
>     (4) If a law requires a signature, an electronic signature satisfies the law.
>
>
> What I heard from the discussion at the UBLF was simply that if you file a document with /s/ and the debtor's name printed after it, you better have a signed copy in your records.   These electronic signature programs keep all the records of the electronic signature handy in the cloud.
>
>
> ~Aaron
>
> ---
>
> **From:** utahdebtorbankruptcy@yahoogroups.com [mailto:utahdebtorbankruptcy@yahoogroups.com]
> **Sent:** Wednesday, October 08, 2014 2:31 PM
> **To:** utahdebtorbankruptcy@yahoogroups.com
> **Subject:** [utahdebtorbankruptcy] Adobe EchoSign v. Wet Signatures

Last week during the Vannova discussion, Russ mentioned that the US Trustee's office had "approved" of using Adobe's EchoSign to obtain and store signatures as an alternative to getting and keeping "wet" signatures.

I got so excited that I called Vince to get confirmation. He said that the US Trustee's office has not and cannot "approve" using EchoSign, that getting and keeping wet signatures was required by the local rules, and that we would need to get a local rule change before we will be able to use EchoSign or other digital-signature software.

Jory is currently the Debtor's representative on the Rules Committe, so those of us who would like to change the rules to allow digital signatures should reach out to and work with Jory to see if we can get it done.

Andrew

___·__·__·____

Posted by: "Aaron Nilsen" <aaron@utahbk.com>

**Reply via web post**  •  Reply to sender  •  Reply to group  •  Start a New Topic  •  Messages in this topic (2)

**VISIT YOUR GROUP**

**YAHOO!** GROUPS     • Privacy • Unsubscribe • Terms of Use

___·__·__·____

--
Russell B. Weekes
Principal
**Weekes Law, PLLC**
SLC: (801) 657-5074
Ogden:(801) 436-8049
Provo: (801) 228-0017
Toll Free: (888) 818-9221
Fax: (888) 612-4236

UNAUTHORIZED INTERCEPTION OF THIS MESSAGE IS PROHIBITED BY FEDERAL LAW PURSUANT TO 18 U.S.C. 2511 (2006).

*CONFIDENTIALITY NOTICE: This message and any files transmitted with it are CONFIDENTIAL and intended for the use of the individual or entity to whom it is addressed. The information may also be protected by the attorney-client privilege, work product immunity, or other legal protections. If you have received this email by mistake, please immediately notify us by reply email or by calling us at (888) 818-9221 and delete it from your system. You may not copy or forward this message or disclose its contents to anyone. Email transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message that arise as a result of email transmission.

*CIRCULAR 230 DISCLOSURE: Pursuant to U.S. Treasury Department Regulations, any federal tax advice contained in this communication, including attachments and enclosures, is not intended or written to be used, and may not be used, for the purpose of (1) avoiding tax-related penalties under the Internal Revenue Code; or (2) promoting, marketing, or recommending to another party any tax-related matters addressed herein.

Case 16-30360    Doc 126-2    Filed 11/20/18    Entered 11/20/18 22:30:17    Desc Exhibit
A    Page 21 of 21